IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LAWSON PRODUCTS, INC., | |
| Plaintiff, | Case No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| MOMAR, INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff Lawson Products, Inc. ("Lawson") states as follows for its Complaint against Defendant Momar, Inc. ("Momar"):

## NATURE OF THE CASE

1.      Over the past two-plus years, Defendant Momar, Inc. ("Momar") has hired at least nine separate sales representatives away from Plaintiff Lawson Products, Inc. ("Lawson"). These sales representatives were not contractually restricted from working for Momar altogether and Momar's mere employment of these individuals is not at issue in this action.

2.      What is at issue, however, is Momar's tortious interference with and knowing disregard for the sales representatives' tailored post-employment customer non-solicitation covenants, which extend no further than necessary to protect Lawson's valuable goodwill, confidential information, and long-standing

and revenue-driving customer relationships. Indeed, each sales representative who later left Lawson for Momar executed valid and enforceable agreements in which they made reasonable promises to refrain from soliciting a subset of Lawson customers for just eighteen (18) months following the end of their Lawson employment.

3.     Despite these reasonable restrictive terms, the sales representatives, aided and encouraged by Momar, flouted them, causing Lawson significant monetary losses. Indeed, the facts indicate that Momar and the sales representatives knew what they were doing was wrong and tried concealing their breaching and tortious actions. For example, at least one of the sales representatives who left Lawson for Momar (Patrick Byron) lied to his own customer about Lawson's business affiliation with Momar, apparently hoping that this falsehood would quell customer and industry concern that he was actively calling upon Lawson's customers for a direct competitor shortly after leaving Lawson.

4.     Momar has succeeded in adding additional revenues to its books by and through its tortious conduct. On the other end, there is Lawson, who paid the sales representatives handsomely for developing and building relationships with key and longstanding Lawson customers, only to lose these investments and incur large financial losses by and through Momar's tortiously interfering in the reasonable non-solicit terms at the heart of this dispute. Momar did this openly, hoping that

Lawson would not take action. Lawson now respectfully seeks relief before this Court to recover the damage it has incurred.

5.     This action seeks money damages from Momar stemming from its tortious interference with Lawson's employment agreements with these nine sales representatives and the loss of Lawson's valuable and longstanding customer relationships flowing from this interference and anti-competitive conduct.

## PARTIES

6.     Lawson is a corporation organized under the laws of the State of Illinois. It maintains its principal place of business in Chicago, Illinois.

7.     Momar is a corporation organized under the laws of the State of Georgia. It maintains its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. Lawson is a citizen of the State of Illinois. Momar is a citizen of the State of Georgia.

9.     The amount in controversy exceeds the Court's jurisdictional minimum. The damages Lawson has incurred based on Momar's tortious interference with contracts and business relationships exceeds $75,000, exclusive of interest and costs.

10.     Venue is proper under 28 U.S.C. § 1391(b) because Momar resides in the

Northern District of Georgia.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

**I.     Overview of Lawson's Business.**

11.    Lawson sells and distributes various products and services to the industrial, commercial, institutional, and governmental maintenance, repair, and operations marketplace. This is generally known within the industry as the "MRO Market."

12.    Lawson's customers operate in a wide range of industries, including automotive repair, commercial vehicle maintenance, government, manufacturing, food processing, distribution, construction, oil and gas services, mining, and others.

13.    The type of MRO products Lawson sells and distributes include fastening systems, cutting tools, chemicals, welding products, abrasives, and other related products.

14.    Lawson sells and distributes these MRO products primarily through employee sales representatives, or "ESRs."

15.    Lawson's ESRs sign, as a condition of employment, a Loyalty and Confidentiality Agreement (or, "LCA"). An LCA includes, among other terms, certain restrictions on the ability of an ESR to solicit or sell to customers on behalf of a Lawson competitor.

16.    Each ESR operates in a particular geographic territory, which is detailed in the LCA.

17.    ESRs are responsible for cultivating existing business relationships, acquiring new customers, expanding sales with existing customers, servicing accounts, and safeguarding valuable customer information for Lawson's benefit.

18.    Lawson ESRs benefit from account exclusivity. That is, an ESR who establishes a business relationship with a customer has the sole opportunity to do business with that customer and earn commission income from sales procured for that customer.

19.    This account exclusivity provides a mutual benefit to Lawson and the ESR. The ESR can create a close, personal connection with customers in his or her territory and thus earn incentive commissions. Lawson, in turn, knows that its sales are more likely to grow as the ESR gains a better understanding of customer needs and develops a relationship designed to secure repeat business.

20.    To this end, a substantial majority of Lawson's sales come from repeat, long-term customers who trust Lawson to serve their MRO product needs regularly.

21.    Lawson's relationships with its customers and earned goodwill provide it with a significant competitive advantage in the MRO Market and constitute valuable company assets.

II.    **Individual ESR's Agreements with Lawson.**

22.    Lawson formerly employed at least nine ESRs who now work for Momar in similar sales roles: Donald Conner, William Price, Patrick Byron, Mike Myers, Shane Patterson, Greg Gardner, James Goebel, Steve Markowitz and Camille Watkins (collectively, the "Former Employees").

23.    Before becoming Lawson ESRs, the Former Employees each were sales representatives for NCH Corporation's Partsmaster division ("Partsmaster") beginning at various times through December 31, 2020.

24.    During their employment with Partsmaster, the Former Employees all signed substantially similar Sales Representative Employment Agreements (the "Partsmaster Agreements"). A true and correct copy of Donald Conner's Partsmaster Agreement is attached as **Exhibit 1**.

25.    Section 5 of each Partsmaster Agreement says that the Former Employees would not, for a period of 18 months after termination of employment:

> [w]ithin the Territory, sell, solicit, service, handle, participate in, assist, coordinate or advise about a sale of products similar or related to [Partsmaster's] Products to any account that [the Employee] sold, serviced, handled, solicited, was assigned or had responsibility for within eighteen (18) months before any termination of employment with Company…

26.    The Partsmaster Agreements also defined "Territory" by identifying certain counties next to the Former Employees' signatures.

27.    The Partsmaster Agreements enabled Partsmaster to "assign this

6

Agreement to any related or successor subsidiary or otherwise."

28.    On August 31, 2020, Lawson entered into an Asset Purchase Agreement with NCH Corporation, under which Lawson acquired NCH's Partsmaster division and assumed certain liabilities (the "Partsmaster Acquisition").

29.    As a result of the Partsmaster Acquisition, Lawson succeeded to all rights and covenants under the Partsmaster Agreements, including those signed by the Former Employees.

30.    Shortly after the Partsmaster Acquisition, Lawson offered to hire the Former Employees as Lawson ESRs.

31.    Each Former Employee accepted Lawson's offer and signed the LCA effective as of January 1, 2021. True and correct copies of each of the Former Employees' LCAs are attached as **Exhibits 2-10**.

32.    Like the Partsmaster Agreements, the LCAs contain certain post-employment restrictive covenants, including a covenant prohibiting the solicitation of certain customers.

33.    Each LCA contains a post-termination non-solicitation covenant in Section 3.3, which states:

> Employee agrees that for a period of eighteen (18) months following the end of Employee's employment with Company, Employee will not directly or indirectly interfere with Company's business relationships with a Covered Customer, by soliciting or communicating (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to:

(i) stop or reduce doing business with Company, or (ii) buy a Conflicting Product or Service, unless a duly authorized Company officer gives Employee written authorization to do so. Employee agrees that direct interference includes, for example, selling a Conflicting Product or Service to a Covered Customer, or soliciting such a sale. Employee agrees that indirect interference includes, for example, (x) sales management or account management responsibility for a Covered Customer where another person or entity has direct solicitation or sales responsibility, and/or (y) acting in concert with another person or entity to sell a Conflicting Product or Service to a Covered Customer, or to solicit such a sale. The parties agree this restriction is inherently reasonable because it is limited to the places or locations where the Covered Customer is doing business at the time.

34.    Section 3.1 of the LCAs defines the terms "Covered Customer" and "Conflicting Product or Service."

35.    The term "Covered Customer" means

…any one of the following: (i) a current customer of Company with which Employee has developed a business relationship or had substantial business contact as a result of Employee's employment with Company; (ii) a customer of Company to which Company has made sales in the twelve (12) month period preceding the end of Employee's employment with Company, and for which Employee was a point of contact; (iii) a prospective customer of Company, where Employee has been actively discussing, on behalf of Company, a potential business relationship, in the twelve (12) month period preceding the end of Employee's employment with Company; or (iv) a customer of Company about which Employee has received, used or accessed Confidential Information. References to the end of Employee's employment in this Agreement refer to the end, whether by resignation or termination, and without regard for the reason employment ended.

36.    The LCAs then define "Conflicting Product or Service" in relevant part as:

8

…a product and/or service that is the same or similar in function or purpose to a Company product and/or service, such that it would replace or compete with: (i) a product and/or service Company provides to its customers; or (ii) a product or service that is under development or planning by Company but not yet provided to customers and regarding which Employee was provided Confidential Information in the course of employment.

37.    In substance, the customer non-solicitation covenants in the LCAs are similar in purpose to the customer non-solicitation covenants in Section 5 of the Partsmaster Agreements. Together, those covenants are referred to as the "Non-Solicitation Covenants."

38.    The Non-Solicitation Covenants in both sets of contracts serve to protect customer goodwill and relationships that the Former Employees develop for their employer's benefit, thus supporting a legitimate Lawson business interest.

39.    The LCAs contain reasonable and adequate consideration for these Non-Solicitation Covenants, reciting the specific elements of consideration (which included signing and retention bonuses) in both Section 1.1 and Exhibit A to the LCAs.

40.    None of the Former Employees objected to any of the LCA's terms. Nor did they try to negotiate any of the covenants contained in the LCAs.

41.    Lawson paid each of the Former Employees the signing and retention bonuses that served as part of the consideration for entering into the LCAs.

42.    Lastly, Section 6 of each LCA states that "if Employee is subject to a

prior agreement containing post-association obligations to [Lawson], this Agreement and such prior agreement will be read together to provide the greatest protection to [Lawson]."

43.     Read together, the Partsmaster Agreements and the LCAs prohibit the Former Employees—for a minimum of 18 months after termination—from soliciting or selling competitive products to those customers for which they were responsible during their employment with Partsmaster and Lawson.

**III.     Momar's Status as a Lawson Competitor.**

44.     Momar is a Lawson competitor, operating nationally in the MRO Market and selling industrial supplies through a network of sales employees.

45.     Momar offers its customers a broad product line, focused principally on general maintenance and sanitation chemicals.

46.     Moreover, Momar purchases other industrial supply products through a distributor relationship with Lawson. Through this relationship, Momar in turn can sell additional MRO products to its customers.

47.     Thus, the customers that Momar serves, or seeks to develop, directly overlap with Lawson's target accounts.

**IV.     Momar's Hiring of the Former Employees.**

48.     Each of the Former Employees voluntarily resigned his Lawson ESR position with little or no notice to Lawson before joining Momar in sales positions

in similar (if not identical) geographic territories.

49.    The Former Employees resigned and/or last worked for Lawson on:

    a.  **Conners**: January 15, 2021 (Georgia counties under the Partsmaster Agreement; Texas counties under the LCA);

    b.  **Price**: February 21, 2021 (Georgia counties);

    c.  **Myers**: January 4, 2022 (Idaho and Oregon counties);

    d.  **Byron**: February 14, 2022 (Colorado and Wyoming counties);

    e.  **Patterson**: last day May 19, 2023 (Oregon counties);

    f.  **Gardner**: May 24, 2023 (Washington, Idaho and Montana counties);

    g.  **Goebel**: May 24, 2023 (Washington counties);

    h.  **Markowitz**: June 30, 2023 (Florida counties); and

    i.  **Watkins**: last day June 30, 2023 (Georgia counties).

50.    At least by June 30, 2021, Momar received a copy of the LCA, knew of its terms (including the non-solicitation covenant in Section 3.3), and understood Lawson's business interest in enforcing the LCA.

51.    Momar is and was a stranger to the LCA contracts between Lawson and each of the Former Employees.

52.    Almost immediately upon joining Momar, the Former Employees began to contact, solicit, and sell to customers that were restricted under the Non-Solicitation Covenants.

53.    In many cases, the Former Employees' subsequent sales activity in violation of the Non-Solicitation Covenants involved their most profitable and highest producing accounts.

54.    For instance, Conner solicited and sold to Price Fiber Mills, his largest Lawson account. Lawson knew of the sales activity because Price Fiber Mills mistakenly sent a purchase order to Conner's former Lawson email address. The purchase order approved a quote from Momar.

55.    Incredibly, Lawson has reason to believe that Price was selling to Glenn Heard Farms (Price's largest account) on Momar's behalf as of January 2021, while Price remained a Lawson employee. Lawson learned of this fact because Glenn Heard Farms employees informed a replacement ESR, who was attempting to reclaim and save Lawson's business at that account. Nevertheless, Glenn Heard Farms stopped buying MRO products from Lawson altogether.

56.    Myers also immediately began contacting his Covered Customers under the LCA after joining Momar. As just one example, Lawson learned that Myers began selling to Fruitland (Idaho) Schools Transportation, one of his larger accounts with Lawson.

57.    Similarly, Byron began selling to over 50 of his former Lawson accounts after beginning work with Momar, despite efforts made by Lawson sales and sales

management employees to visit and save this business. Just as troubling, Lawson learned that Byron represented himself, while selling for Momar, as still affiliated with Lawson—going so far as to tell customers that Lawson was a "subsidiary" of Momar.

58.   Byron's deceptive statements about Lawson coincidentally mirror other improper conduct by other Former Employees while they have sold for Momar.

59.   Patterson immediately began contacting his Covered Customers under the LCA as well, and on behalf of Momar contacted Barreto Manufacturing and began selling to Barreto Manufacturing on Momar's behalf.

60.   Likewise, Gardner and Goebel each contacted their Covered Customers under their LCA, solicited business from them and began selling to their Covered Customers—including, respectively, Othello School District (Gardner) and Puyallup School District (Goebel)—on Momar's behalf.

61.   Markowitz's improper actions with respect to Covered Customers under his LCA included contacts with Palm Beach State College, A/C Shop and RC Truck Sales.

62.   Watkins' improper actions with respect to Covered Customers under her LCA included contacted with Ascendum/Volvo and United Rentals.

63.   The foregoing examples are illustrative (not exhaustive) of particular facts Lawson has been able to uncover on its own, without the benefit of discovery,

showing each of the Former Employees repeatedly violated the Non-Solicitation Covenants while selling for Momar.

64.     What's more, certain statements by these now-Momar sales representatives attempt to capitalize on Lawson's earned customer goodwill by wrongly suggesting an affiliation between Lawson and Momar that does not exist.

65.     The Former Employees' sales activity on Momar's behalf in accounts covered by the Non-Solicitation Covenants has resulted in either a total or material impairment of each Former Employee's account base with Lawson.

66.     Despite knowing of the Non-Solicitation Covenants, Momar installed no controls, protocols, or procedures of any kind to ensure that the Former Employees complied with the terms of their restrictive covenant.

67.     Instead, by hiring the Former Employees and encouraging them to sell in the same territory and same account base each sold to for Lawson, Momar has provided each Former Employee an indispensable platform to sell MRO products to customers covered by the Non-Solicitation Covenants.

68.     Thus, Momar's activity went beyond passive knowledge of the Non-Solicitation Covenants. Momar instead actively facilitated and induced each Former Employee's contractual violation, causing Lawson monetary damage.

69.     Upon information and belief, Momar compensates the Former

Employees through commissions or other incentives (either in whole or in part), thus inducing the Former Employees to look first to accounts with which they are most familiar and which are covered by the Non-Solicitation Covenants.

70.    Upon further information and belief, Momar knew the Former Employees' continued MRO sales violated the Non-Solicitation Covenants because the Former Employees immediately generated substantial sales with high-volume customers far sooner than the typical MRO salesperson could reasonably expect to achieve during the sales prospecting, quoting, and selling process.

71.    Upon further information and belief, Momar deliberately turned a blind eye to the Former Employees' sales activity with their former Lawson accounts and installed no compliance mechanisms of any kind to ensure the Former Employees honored their Non-Solicitation Covenants.

72.    Simply by way of example, despite knowing of Lawson's concerns about the Former Employees' ongoing breach, Momar instituted no discipline for any of them. Momar's tacit, if not express, approval of the Former Employees' sales activity in accounts covered by the Non-Solicitation Covenants itself induced the Former Employees to continue violating their ongoing contractual obligations to Lawson because the Former Employees knew they faced no risk of discipline from Momar.

73.    As a result of Momar's knowledge of the Non-Solicitation Covenants and

inducement to have the Former Employees violate them, Lawson has incurred substantial lost profits and impaired customer goodwill relating to each of the Former Employee's account base.

## CAUSES OF ACTION

### COUNT ONE – TORTIOUS INTERFERENCE WITH CONTRACT

74.    Lawson realleges the allegations in paragraphs 1 through 73 as if fully set forth in this paragraph.

75.    The LCAs between Lawson and the Former Employees are valid and enforceable contracts. Momar is and was a stranger to each of the respective LCA contracts between Lawson and the Former Employees. It is and was also a stranger to the business relationship(s) giving rise to and underpinning the LCA contracts.

76.    The Partsmaster Agreements between NCH and the Former Employees, and for which Lawson is the assignee, are valid and enforceable contracts. Momar is and was a stranger to each of these contracts. It is and was also a stranger to the business relationship(s) giving rise to and underpinning them.

77.    The Non-Solicitation Covenants are reasonably and narrowly tailored to protect legitimate business interests of customer goodwill, impose no undue hardship on the Former Employees, and are not against the public interest.

78.    Each of the Former Employees breached the Non-Solicitation Covenants by selling to former Lawson and Partsmaster customers while employed with

Momar during the restricted period in the Non-Solicitation Covenants.

79.   Momar knew each of the Former Employees had agreed to the Non-Solicitation Covenants.

80.   On information and belief, Momar intentionally and knowingly induced each of the Former Employees to violate the Non-Solicitation Covenants by: (a) declining to implement any measures to ensure compliance, (b) tacitly or expressly encouraging and incentivizing the Former Employees to sell to customers in violation of the Non-Solicitation Covenants, and (c) declining to discipline any of the Former Employees when learning that they had solicited or sold to Lawson customers in violation of the Non-Solicitation Covenants.

81.   Momar's wrongful and unjustified inducement proximately caused each of the Former Employees' breach because Momar provided an indispensable sales and operational platform through which the Former Employees could continue selling MRO products to customers in violation of the Non-Solicitation Covenants.

82.   Momar's wrongful and unjustified interference with the Non-Solicitation Covenants signed by each of the Former Employees has caused Lawson to incur lost profits and impaired customer goodwill in an amount to be determined at trial.

83.   Momar's wrongful and unjustified interference with the Non-Solicitation Covenants was willful and malicious, warranting punitive damages in an amount to be determined at trial.

## COUNT TWO – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

84.    Lawson realleges the allegations in paragraphs 1 through 73 as if fully set forth in this paragraph.

85.    Lawson has longstanding, repeat, or valuable continuing business relationships with many of its customers, including those which each of the Former Employees solicited on behalf of Momar in violation of the Non-Solicitation Covenants. Momar is and was a stranger to the business and contractual relationships between Lawson and its customers, including those which each of the Former Employees have now solicited on Momar's behalf.

86.    Thus, based on prior sales history and material knowledge of its customers' buying patterns and practices, Lawson had a reasonable expectation of continuing to sell to customers previously serviced and managed by the Former Employees.

87.    At all relevant times, Momar was aware of Lawson's longstanding, repeat, and valuable ongoing business relationship with customers previously serviced and managed by the Former Employees.

88.    Momar intentionally interfered with Lawson's expectation of continued sales to its customers by soliciting and selling competitive products to Lawson's customers through the Former Employees.

89.    Momar used wrongful means to interfere with Lawson's business

relationships with customers previously serviced and managed by the Former Employees because Momar (a) intentionally hired the Former Employees, knowing they had strong relationships with existing Lawson customers, (b) knew the Former Employees were bound by the Non-Solicitation Covenants, and (c) purposefully induced, encouraged, or approved of the Former Employees' efforts to solicit and sell MRO products to those same customers for Momar's benefit, in violation of the Non-Solicitation Covenants.

90.    These business relationships, which the Former Employees previously cultivated for Lawson and Partsmaster, would have resulted in sales for Lawson in the absence of Momar's interference.

91.    Momar has succeeded in ending or materially impairing many of Lawson's relationships with the Former Employees' customer base.

92.    Momar's actions were purposeful, with malicious and unjustifiable intent.

93.    As a direct and proximate result of Momar's conduct, Lawson has incurred lost profits and impaired customer goodwill in an amount according to proof at trial.

WHEREFORE, Lawson Products prays that this Court enter judgment for it and against Momar for an award of lost profits to be proven at trial, punitive damages against Momar, and any other relief this Court deems just and appropriate under

the circumstances.

## JURY TRIAL DEMANDED

Lawson requests a trial by jury for all counts so triable.

Respectfully submitted this 18th day of December, 2023.

*/s/ Rachel P. Kaercher*
Rachel P. Kaercher
Georgia Bar No. 743007
rkaercher@littler.com
Littler Mendelson, P.C.
3424 Peachtree Road, NE, Suite 1200
Atlanta, Georgia 30326
T:  (404) 233-0330

Richard T. Kienzler (*pro hac vice* application to be submitted)
rkienzler@littler.com
Colton D. Long (*pro hac vice* application to be submitted)
clong@littler.com
Littler Mendelson, P.C.
321 North Clark Street, Suite 1100
Chicago, Illinois 60654
T:  (312) 372-5520
